IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| JAMES ROBERT ERNST, II,<br><br>Plaintiff,<br><br>vs.<br><br>BLACK HAWK COUNTY JAIL, SGT. STAINBROOK, TONY SHADER, CAPTAIN HERBST, DEPUTY FROST, DEPUTY SIECH and VANDER ZWAAG,<br><br>Defendants. | No. C16-2005<br><br>REPORT AND RECOMMENDATION |

On the 26th day of September 2016, this matter came on for an evidentiary hearing at the Newton Correctional Facility in Newton, Iowa. Plaintiff James Robert Ernst, II, appeared in person and was unrepresented by counsel. All six individual Defendants appeared in person and were represented by their attorney, John T. McCoy.

## I. PROCEDURAL HISTORY

On January 13, 2016, Plaintiff James Robert Ernst, II, filed an application to proceed *in forma pauperis* on a civil rights claim. Attached to the application was a complaint filed pursuant to 42 U.S.C. § 1983, claiming Defendants violated Ernst's Constitutional rights. On March 11, Judge Edward J. McManus granted Ernst's application and directed the clerk of court to file and serve the complaint without the prepayment of fees.

Defendants filed an answer and affirmative defenses on April 21. Defendants denied the allegations generally and affirmatively asserted Ernst had failed to exhaust his administrative remedies, and Defendants were entitled to qualified immunity.

On May 13, Defendants filed a motion for summary judgment. In an Order filed on June 21, Judge McManus dismissed all of Ernst's claims, except one. Judge McManus concluded that "[t]here exists a genuine question of fact as to whether the events surrounding the March 30, 2015, assault of plaintiff rise to the level of a violation of plaintiff's civil rights under § 1983 by defendants." In the same Order, Judge McManus referred the case to me for a report and recommendation.

## II. RELEVANT FACTS

On January 2, 2015, Plaintiff James Robert Ernst, II, was arrested, charged with first degree murder, and booked into the Black Hawk County Jail. According to the booking log, Ernst reported receiving death threats.

> HE HAS BEEN RECEIVING DEATH THREATS — BELIEVES SOME OF THEM INITIATED FROM INMATES INCARCERATED HERE. HE ONLY HAS GANG NAMES — NO GIVEN NAMES.

Booking Log, 01/02/2015 (Plaintiff's Exhibit 3). Ernst's victim, Orintheo Campbell, Jr., was a member of the Black Flag Mafia, a gang in Waterloo. It was believed gang members posed a threat to Ernst's safety. Because of the threats, Ernst was placed in "A pod" in protective custody.

According to Captain Mark Herbst, one of the defendants in this case, jail officials knew some of the gang members being housed at the jail, but not all. On January 10, a "keep separate" entry was added to the booking log, which stated:

> BLACK FLAG MAFIA MEMBERS — CHRIS ROBY, NATHANIEL MATLOCK, PERQUONDIS HOLMES, DEVATE EWELL (VICTIM IN HIS CASE IS ORINTHEO CAMPBELL JR. WHO IS BLACK FLAG).

Booking Log, 01/10/2015 (Plaintiff's Exhibit 3).

Captain Herbst, who is employed by the Black Hawk County Sheriff's Office as jail administrator, testified that one of the "fundamental responsibilities" of the jail is "to keep inmates safe." Because of the reported threats, Ernst was placed in protective custody in

2

Unit A-2. Herbst explained that protective custody is not intended to be punitive, but instead is intended to keep an inmate separate from other inmates for the inmate's own safety. While in A-2, an inmate is only released from his cell for one hour a day; and when the inmate is out of his cell, he has no contact with other inmates. The type and number of personal items permitted an inmate in A-2 is also limited.[1]

On February 3, Ernst submitted a written complaint that he had contact with another inmate in A pod when they were both exercising visitation.[2] According to the booking log, however, on February 6, Ernst requested to be moved out of A-2 and into a less restrictive setting. Ernst was told he was in protective custody, but the staff member making the entry in the booking log indicated he "would ask." Ernst advised the staff member that "he wanted a complaint form instead; stated he'd already asked."[3] Ernst then filed a written complaint asking to be moved and wrote that he "[n]ever asked to be placed in A-2 or under protective custody."[4] (This was just three days after Ernst complained about having contact with another prisoner.)

Two days later, on February 8, a booking log entry indicates that Ernst's classification status was reviewed, but due to continuing threats, he remained on protective custody status. On the same day, Ernst filed an inmate request form, advising jail staff that he had "found out" that the gang was "Black Flag," which included Chris Roby and a couple of other persons. One of the deputies responded on February 9, stating:

> You have keep separates already in your log for Chris Roby, Nathaniel Matlock, Perquondis Holmes, & Devate Ewell ("Red"). So you will not have contact with those individuals

---

[1] The Black Hawk County Jail Policy Regarding Maximum Security Housing was introduced as Defendants' Exhibit K.

[2] Inmate Complaint, 2-3-15 (Defendants' Exhibit D).

[3] Booking Log, 02/06/2015 (Defendants' Exhibit C).

[4] Inmate Complaint, 2/6/15 (Defendants' Exhibit D).

3

and they won't have any contact with you as long as you are
in jail. If there are others that aren't listed, fill out another
kyte with those names on it so we can get them entered into
the computer.

Inmate Request Form, 2-8-15 (Plaintiff's Exhibit 1). Also on February 9, another "keep separate" entry was made into the booking log, identifying Orintheo Campbell, Sr., the father of Ernst's victim.

Captain Herbst testified that he continued receiving complaints about Ernst being housed in Unit A-2. Ernst and his attorney claimed that Ernst's civil rights were being violated. The State Ombudsman was investigating Ernst's complaints. Herbst testified he was "trying to walk a very fine line" between what Ernst believed was a violation of his civil rights and Herbst's duty to keep Ernst safe. According to Herbst, he knew "full well that there was probably some legitimacy as to what [Ernst] was saying about his safety." On February 25, 2015, Ernst was afforded additional privileges which were not generally available to other inmates housed in A-2.

On March 16, Ernst was taken off protective custody status and placed in Unit A-3 "to start." Two more "keep separate" entries were entered in the booking log. A "keep separate" entry on March 17 identifies Trivansky Swington. A "keep separate" entry on March 23 states:

> KEEP SEPARATE FROM ANTONIO CAMPBELL HE IS
> THE COUSIN OF ERNST'S MURDER VICTIM.

Booking Log, 03/23/2015 (Defendants' Exhibit C).

On March 25, Ernst submitted a written request to go to "gp" (general population).[5] Ernst was moved from A-3 to the "D pod." Five days later, after receiving a call from Ernst's attorney, jail staff discovered that another of Campbell's cousins was in D pod.

> WITH ROBERT CAMPBELL. COUSIN OF HIS MURDER
> VICTIM. MOVED TO F POD FROM D POD. K/S

---

[5] Inmate Request, 3/25/14 [sic] (Defendants' Exhibit D).

4

ENTERED WITH ROBERT CAMPBELL, COUSIN OF HIS MURDER VICTIM. HIS LAWYER ALSO CALLED AND WANTED HIM MOVED OUT OF D POD DUE TO CAMPBELL.

Booking Log, 03/30/2015 (Defendants' Exhibit C).

Sergeant Adam Stainbrook, one of the Defendants in this case, authorized Ernst's transfer out of D pod. Deputy Levi Frost, another Defendant in this case, was the "housing officer" in D pod on March 30, and was responsible for determining where Ernst would be moved. Frost reviewed Ernst's booking log and found the "keep separate" entry on January 10. The computer screen showed "keep separate" and identified "BLACK FLAG MAFIA MEMBERS — CHRIS ROBY." *See* Plaintiff's Exhibit 2. The screen had a "scroll bar," however, which allowed Frost to scroll to the right, revealing a second name — Nathaniel Matlock.[6] According to Frost, it was not possible to scroll over further, nor did the software allow Frost to "click" on the bar in order to "drill down" to the original entry. Ernst testified that he told Frost he preferred to stay in D pod because he "already knew who to look for," but Frost told Ernst that he had "looked into it and said everything is fine" on F pod.

Deputy Frost acknowledged that he knew on March 30 that additional information could be found at a different place in the booking log. That is, if he had looked at a different screen, Frost would have seen the names of Perquondis Holmes and Devate Ewell. According to Frost, however, that would have taken "several extra steps." Frost decided that Ernst would be moved to F pod.

At approximately 3:00 p.m. on March 30, 2015, Deputy Tony Shader, another Defendant in this case, was working as a "rover" at the Black Hawk County Jail. Shader escorted Ernst from D pod to F pod and told Ernst to report any problems. Deputy Joseph Siech, another Defendant, was the shift officer in F pod when Ernst arrived. Siech

---

[6] A "screen shot" of the entry after scrolling to the right was not offered at the hearing.

5

assigned Ernst a cell in Unit F-3. Inmates housed in F-3 are permitted to use the day room in Unit F-2, although it is necessary to be "buzzed" through a locked door.[7]

At approximately 3:15 p.m., Ernst entered the F-2 day room and proceeded directly to the telephone on the far side of the room. (There was a telephone in F-3, but Ernst testified he was going to the day room in any event.) While he was on the phone, Ernst was assaulted by Perquondis Holmes (one of the persons listed on the "keep separate" entry on January 10) and Taevon Washington. Ernst did not know Holmes prior to these events and, in fact, did not know any of the persons on the "keep separate" list. A video recording of the assault was introduced as Defendant's Exhibit A.

Deputy Jordan Vander Zwaag, another Defendant in this case, was the officer on duty in F pod when the assault occurred. The video recording shows that Vander Zwaag intervened in the assault within four or five seconds after it began. Within another ten seconds or so, Vander Zwaag successfully separated Ernst from his assailants. Additional deputies arrived, Ernst returned to his cell, and Holmes and Washington were removed from the unit.

Ernst did not offer any evidence regarding the nature and extent of his injuries. However, Defendants' Exhibit E includes a report from Deputy Heather Dolan, who was called to take photographs of Ernst, Holmes, and Washington. The photographs were not introduced as exhibits at the hearing, but Dolan described Ernst's injuries as follows:

> James Ernst had three scratches located on his left arm just above the elbow, a large scrape on his right knee, and on his right eye there was a small bruise underneath it and bruising near the outer corner portion.

---

[7] According to Deputy Shader, the F pod was initially designed to house women and Unit F-3, consisting of only four cells, was designed for maximum security within the F pod. There is a small common area in F-3, but the larger day room with a television is in F-2.

Narrative Report of Deputy Heather Dolan (Defendants' Exhibit E). There is no indication Ernst saw a nurse or received any treatment. Holmes was given a band-aid because of a small scratch on his hand.

On the following day, March 31, jail staff entered individual "keep separate" notes for each of the persons named in the January 10 note, and added Taevon Washington.

### III. DISCUSSION

The law underlying Ernst's claim is well-established. The "cruel and unusual punishments" clause of the Eighth Amendment requires, among other things, that prison officials must "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This includes a duty "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. While the Eighth Amendment applies only to convicted prisoners, the Due Process Clause of the Fourteenth Amendment provides rights which are "*at least as great* as the Eighth Amendment protections available to a convicted prisoner." *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014) (italics in original). Indeed, Captain Herbst, who is the jail administrator, conceded at trial that one of the "fundamental responsibilities" of the jail is "to keep inmates safe."

Recovery under the Eighth or Fourteenth Amendments has two components. First, the inmate must be incarcerated "under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. This is an objective test. The second requirement is subjective. That is, a prison official must have a "sufficiently culpable state of mind." *Id. See also Chavero-Linares v. Smith*, 782 F.3d 1038, 1041 (8th Cir. 2015); *Edwards v. Byrd*, 750 F.3d 728, 733 (8th Cir. 2014).

Here, the first requirement — an objective finding that Ernst's placement in F pod posed a substantial risk of serious harm — is easily met. Ernst's victim was a member of the Black Flag Mafia gang. Ernst was placed in the same housing unit as Perquondis Holmes, a known member of the Black Flag Mafia gang and an individual identified on the "keep separate" list.

7

The second requirement — that the jail officer have a "sufficiently culpable state of mind" — presents a closer question. The Court must determine whether jail officials acted with "deliberate indifference" in placing Ernst in an objectively dangerous position. Mere negligence will not establish liability. *Farmer*, 511 U.S. at 835 ("Deliberate indifference describes a state of mind more blameworthy than negligence."). It is not necessary, however, that a jail official's actions be intentional. *Id.* (Deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.") "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness." *Id.* at 836.

The petitioner in *Farmer* was transsexual. The petitioner was initially placed in administrative segregation at a federal prison, but then moved to general population. Petitioner voiced no objection, but within two weeks was beaten and raped by another inmate in petitioner's cell. Petitioner was then returned to segregation. The district court granted summary judgment to the respondents, and the Court of Appeals affirmed. The Supreme Court reversed, however, and remanded the case for further proceedings. The Court held that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. The Court remanded for further proceedings because the district court denied the petitioner's RULE 56(f) motion for additional time to gather evidence to support his allegations.

In *Schoelch v. Mitchell*, 625 F.3d 1041 (8th Cir. 2010), an inmate attacked the plaintiff, a fellow pretrial detainee, leaving Schoelch with facial injuries that required surgery. *Id.* at 1043. Schoelch brought an action against a jail employee, alleging he failed to protect Schoelch from the other inmate. The other inmate had a reputation for

8

"aggressiveness and misbehavior." *Id.* at 1044. Despite threats made toward Schoelch by the other inmate, the jailer opened Schoelch's cell, where Schoelch was promptly assaulted by the other inmate. The incident lasted "maybe a couple seconds," and ended when another inmate intervened. A few weeks later, Schoelch was assaulted again by the same inmate in the lunch room. Schoelch suffered several facial fractures and lost teeth in the attack. In affirming the district court's grant of summary judgment in favor of the defendants, the Court of Appeals summarized the applicable law as follows:

> The Eighth Amendment requires officials to "provide humane conditions of confinement" by taking reasonable steps to protect inmates convicted of crimes from assault by other inmates. Schoelch's custodians had a comparable duty to protect Schoelch as a pretrial detainee, although this duty arose under the Due Process Clause of the Fourteenth Amendment. To prove unconstitutional failure to protect from harm, Schoelch must show (1) an "objectively, sufficiently serious" deprivation, meaning that he was incarcerated under conditions posing a substantial risk of serious harm, and (2) that the defendant was deliberately indifferent to the substantial risk of serious harm. The second requirement is a subjective test; the defendant must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Id.* at 1046 (citations omitted).

The Court concluded that Schoelch presented no evidence that he suffered any injury as a result of the first incident. Regarding the second incident, the Court concluded that there was "insufficient evidence to establish that [the guard] was deliberately indifferent to a substantial risk of serious harm to Schoelch on that date." *Id.* at 1047. The Court noted that during the two weeks between the first and second incidents, Schoelch and the other inmate "recreated, dined, and resided together" in the same unit without incident. Schoelch had not requested a transfer from the unit or otherwise suggested to anyone that the other inmate posed a threat.

I believe the facts in this case are distinguishable from those in *Schoelch*. Here, jail officials had actual knowledge that persons being held in the jail posed a threat to Ernst's safety. At least eight individuals were placed on a "keep separate" list, as well as all Black Flag Mafia gang members generally. Perquondis Holmes, who was placed on the keep separate list shortly after Ernst was booked in, assaulted Ernst within minutes after Ernst was placed in F pod. Deputy Frost, who was responsible for determining where Ernst would be moved, admitted he knew that threats had been made against Ernst, and he knew that various inmates had been placed on a "keep separate" list. Nonetheless, Frost made only a half-hearted effort to determine whether any of those "keep separate" inmates were being housed in F pod. Frost acknowledged that when he decided to place Ernst in F pod, he could have looked at a different screen which would have shown all of the persons on the keep separate list, but explained it would have taken "several extra steps." I believe Frost's failure to take those "extra steps" is more than merely negligent. I believe it displays recklessness and deliberate indifference to Ernst's safety.

Deputy Frost admitted he was aware of threats made against Ernst. Furthermore, Frost was told on the day of the incident that Ernst was being moved because one of his victim's relatives was housed in the same pod. Frost admits he understood the importance of placing Ernst in a housing unit where he would not have contact with potential threats. Nonetheless, Ernst was assigned to F pod, which also housed Perquondis Holmes, one of the persons listed on the "keep separate" entry on January 10.

Defendants argue they are protected by the doctrine of qualified immunity. "Qualified immunity protects state actors from civil liability when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kahle v. Leonard*, 477 F.3d 544, 549 (8th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Here, Defendant's Fourteenth Amendment obligation to protect prisoners from violence at the hands of other prisoners was well-established at the time of this incident. Furthermore, as set forth above, the

evidence established that Deputy Frost violated Ernst's Fourteenth Amendment rights by placing him in a housing unit with a known threat. Accordingly, qualified immunity does not provide Frost with a safe harbor.

Qualified immunity under similar circumstances was discussed by the Court in *Walton v. Dawson*, 752 F.3d 1109 (8th Cir. 2014). Because a jailer did not lock the cell doors at night, another inmate was able to enter Walton's cell and leave him "physically bloodied and emotionally bruised." *Id.* at 1114. The Court reviewed the duty of jail officials to protect Walton — a pretrial detainee — from harm. Walton did not sue the jailer directly, but sued the jail administrator for failing to properly train. The Court affirmed the trial court's denial of qualified immunity for the jail administrator.

Defendants also argue that Ernst failed to exhaust his administrative remedies. In this case, however, Ernst's complaints were not of an ongoing nature. In other words, before Ernst could sue in federal court regarding the conditions of his detention, it would be necessary to first and seek administrative relief. However, Ernst's complaint in this case is founded on a single incident when a decision was made to place him in a housing unit with a known threat. As a consequence, he was assaulted. No after-the-fact remedy is available. Any request for "administrative relief" would have been meaningless. Accordingly, under these circumstances, it was not necessary for Ernst to first seek administrative relief.

## IV. SUMMARY

In summary, I believe Deputy Frost violated Ernst's Fourteenth Amendment rights by placing him in the same housing unit with Perquondis Holmes. Frost knew there were threats made against Ernst, and knew there was a list of persons from whom Ernst should be kept separate. Nonetheless, Frost took only half-measures in determining whether placing Ernst in F pod would constitute a danger, despite knowing that additional information could be obtained by taking "several extra steps" on the computer. Because the evidence shows Frost violated Ernst's clearly established constitutional rights, qualified

immunity is inapplicable. Furthermore, there was no administrative relief which Ernst could obtain. Therefore, I believe judgment should be entered in favor of Ernst and against Frost.[8] Due to the quick intervention of Deputy Vander Zwaag, Ernst suffered only minor injuries and did not require any medical attention. I suggest judgment in the amount of $500.

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that judgment enter in favor of Plaintiff James Robert Ernst, II, and against Defendant Levi Frost in the amount of Five Hundred Dollars ($500.00). The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on September 26, 2016.*

DATED this 9th day of December, 2016.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[8] I find no fault in the actions of the remaining Defendants.